**Case No. 21-10994**

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

JOHN D. CARSON, SR.,
Plaintiff/Appellant,

v.

MONSANTO COMPANY,
Defendant/Appellee.

---

On Appeal from the United States District Court
for the Southern District of Georgia,
No. 4:17-cv-00237-RSB-CLR (Baker, J.)

---

**BRIEF OF PROPOSED *AMICI CURIAE*
FARMWORKER ASSOCIATION OF FLORIDA,
FARMWORKER JUSTICE, MIGRANT CLINICIANS NETWORK,
PESTICIDE ACTION NETWORK, UNITED FARM WORKERS, AND
UFW FOUNDATION IN SUPPORT OF PLAINTIFF-APPELLANT AND IN
SUPPORT OF REVERSAL**

PATTI GOLDMAN
Earthjustice
810 Third Ave., Ste. 610
Seattle, WA 98104-1711
(206) 343-7340
pgoldman@earthjustice.org

CARRIE APFEL
Earthjustice
1001 G Street, NW, Suite 1000
Washington, DC 20001
 (202) 797-4310
capfel@earthjustice.org

ALEXIS ANDIMAN
PETER LEHNER
Earthjustice
48 Wall St., 19th Fl.
(212) 845-7376
aandiman@earthjustice.org
plehner@earthjustice.org

ALISA COE
Earthjustice
111 S Martin Luther King Jr. Blvd
Tallassee, FL 32301
(850) 681-0031
acoe@earthjustice.org

*Counsel for Amici Curiae Farmworker Association of Florida, Farmworker Justice,
Migrant Clinicians Network, Pesticide Action Network, United Farm Workers &
UFW Foundation*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................... iii

CORPORATE DISCLOSURE STATEMENT AND CERTIFICATE OF INTERESTED PERSONS ..................................................................................1

STATEMENT OF *AMICI* INTEREST.......................................................................2

FACTUAL BACKGROUND .......................................................................5

SUMMARY OF ARGUMENT ....................................................................9

ARGUMENT ...............................................................................................11

I.   FIFRA PLACES THE BURDEN ON PESTICIDE MANUFACTURERS TO ENSURE THEIR LABELS ARE AT ALL TIMES ADEQUATE TO PROTECT HEALTH AND THE ENVIRONMENT...................................11

A. Manufacturers Must Craft Pesticide Labels To Comply With FIFRA's Protective Health Standard. ........................................................11

B. Manufacturers Have An Ongoing Duty To Update Their Labels And Are Liable For Misbranding If Their Labels Are Not Adequate To Protect Health And The Environment...................................................................13

II.  FIFRA'S PREEMPTION PROVISION AND SUPREME COURT PRECEDENT ALLOW STATES TO PROVIDE ADDITIONAL REMEDIES FOR VIOLATING FIFRA'S MISBRANDING STANDARDS...................................................................................15

A. States Retain The Authority To Add Use Restrictions............................16

B. States Can Provide Additional Remedies For Violations of FIFRA's Standards.................................................................................17

III. FIFRA DOES NOT PREEMPT CARSON'S FAILURE-TO-WARN CLAIM..............................................................................................19

A. States Can Provide Remedies That Lead To Changes In EPA-Approved Labels In Order To Avoid Misbranding...................................................19

B. EPA Has No Monopoly On Determining What Constitutes Misbranding. ..............................................................................21

C. EPA's Approval Or Disapproval Of A Label Has No Preemptive Effect...................................................................................................22

IV. EPA'S APPROVAL OF A MANUFACTURER'S PROPOSED LABEL OFTEN FAILS TO ADDRESS IMPORTANT HEALTH RISKS, AND TORT LIABILITY CAN INDUCE THE MANUFACTURER TO FILL THE GAPS.....................................................................................................26

CONCLUSION ...........................................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bates v. Dow Agrosciences LLC*,
544 U.S. 431 (2005).......................................................... 17, 18, 19, 20, 21, 24, 26

*Carson v. Monsanto*,
No. 4:17-00237 ....................................................................................19, 22

*City of N.Y. v. Fed. Commc'n Comm'n*,
486 U.S. 57 (1988)....................................................................................24, 25

*Ctr. for Env't Health v. McCarthy*,
192 F. Supp. 3d 1036 (2016) ......................................................................27

*Env't Def. Fund v. EPA*,
510 F.2d 1292 (D.C. Cir. 1975).................................................................15

*Fellner v. Tri-Union Seafoods, LLC*,
539 F.3d 237 (3rd Cir. 2008) ......................................................................24

*League of United Latin Am. Citizens et al. v. Regan*,
996 F.3d 673 (9th Cir. 2021) .....................................................................30

*Organized Migrants in Cmty. Action, Inc. v. Brennan*,
520 F.2d 1161 (D.C. Cir. 1975)...................................................................11

*Pollinator Stewardship Council v. EPA*,
806 F.3d 520 (9th Cir. 2015) .....................................................................28

*Reid v. Johnson & Johnson*,
780 F.3d 952 (9th Cir. 2015) .....................................................................24

*Rumsey v. Freeway Manor Minimax*,
423 S.W.2d 387 (Tex. Civ. Appeals Ct. 1968)...................................................18

*U.S. v. Mead Corp.*,
533 U.S. 218 (2001)....................................................................................24, 25

*Wis. Pub. Intervenor v. Mortier*,
501 U.S. 597 (1991).....................................................................................16

**Statutes**

7 U.S.C. § 136(q) ..................................................................................................14

7 U.S.C. § 136(q)(1)(F)........................................................................................14

7 U.S.C. § 136(q)(1)(G)........................................................................................14

7 U.S.C. §136(q)(2)(A) .........................................................................................14

7 U.S.C. §136(q)(2)(D) .........................................................................................14

7 U.S.C. § 136a(a)..................................................................................................12

7 U.S.C. § 136a(c)(1)(C)..................................................................................12, 25

7 U.S.C. § 136a(c)(5) .............................................................................................15

7 U.S.C. § 136a(c)(7) .............................................................................................27

7 U.S.C. § 136a(f)(1) ........................................................................................15, 25

7 U.S.C. § 136a(f)(2) ........................................................................................14, 20

7 U.S.C. § 136a(g)(1)(A)(iii) .................................................................................27

7 U.S.C. § 136d......................................................................................................21

7 U.S.C. § 136d(a)(2).............................................................................................14

7 U.S.C. § 136j(a)(2)(G) ........................................................................................12

7 U.S.C. § 136j(a)(1)(E) ........................................................................................14

7 U.S.C. § 136k(a) .................................................................................................21

7 U.S.C. § 136l.......................................................................................................21

7 U.S.C. § 136n......................................................................................................25

7 U.S.C. § 136v(a) .................................................................................................16

7 U.S.C. § 136v(b) .................................................................................................16

7 U.S.C. § 136w-1(a) ........................................................................................22, 24

21 U.S.C. § 346a(b)(2)(D)(viii) ...................................................................28

Pub. L. No. 92-516, 86 Stat. 996 (1972)......................................................11

**Other Authorities**

40 C.F.R. pt. 159 ........................................................................................14

40 C.F.R. § 152.42 ......................................................................................12

40 C.F.R. § 152.50(e)..................................................................................12

40 C.F.R. § 152.50(f)(3) .............................................................................12

40 C.F.R. § 156.10(a)(5)(ii) ........................................................................26

40 C.F.R. § 159.160(c)................................................................................30

40 C.F.R. § 164.80 ......................................................................................15

110 Cong. Rec. 2948-49 (1964)...................................................................15

57 Fed. Reg. 38102-01 (Aug. 21, 1992) ......................................................11

59 Fed. Reg. 38,973-02 (Aug. 1, 1994) .......................................................17

79 Fed. Reg. 15,444 (Mar. 19, 2014)............................................................7

80 Fed. Reg. 67,496 (Nov. 2, 2015)....................................................6, 7, 8

80 Fed. Reg. 69,080-01 (Nov. 6, 2015) .......................................................29

86 Fed. Reg. 48,315-01 (Aug. 30, 2021) .....................................................30

87 Fed. Reg. 76,474-02 (Dec. 14, 2022)......................................................30

Agency Response to Pesticides in the Air – Kids At Risk: Petition to
    EPA to Protect Children from Pesticide Drift (Mar. 31, 2014).........................29

Edward A. Straw et al., *Roundup Causes High Levels of Mortality
    Following Contact Exposure in Bumble Bees*, J. Applied Ecology
    (2021) .....................................................................................................27

EPA, *Endocrine Disruptor Screening Program Timeline*, https://www.epa.gov/sites/production/files/2016-04/documents/edsp-timeline-042016.pdf ........................................................28

*Introduction to Pesticide Drift*, EPA, http://www.epa.gov/reducing-pesticide-drift/introduction-pesticide-drift ........................................................7

EPA, Pesticide Product Label, LORSBAN-4E (Sept. 30, 2013), https://www3.epa.gov/ pesticides/chem_search/ppls/062719-00220-20130930.pdf..............................................................................13

EPA, Revised Chlorpyrifos Human Health Risk Assessment (Dec. 29, 2014) ....................................................................................29

H.R. Rep. No. 511, 92d Cong., 1st Sess. (1971) ......................................................11

H. Rep. No. 2671, 117th Cong., 2d Sess. (Dec. 20, 2022) ....................................29

JBS Int'l, *Findings from the National Agricultural Workers Survey (NAWS) 2015–16: A Demographic and Employment Profile of United States Farmworkers* (2018), https://www.doleta.gov/naws/research/docs/NAWS_Research_Report_13.pdf........................................................................6, 8

Nat'l Inst. of Occupational Safety & Health, Ctrs. for Disease Control & Prevention, *Agricultural Safety*, https://www.cdc.gov/niosh/topics/aginjury/default.html ..................................5

Nat'l Inst. of Occupational Safety & Health, Ctrs. for Disease Control & Prevention, *Risk of Illness from Pesticide Drift Greatest for Agricultural Workers, Study Finds* (June 6, 2011), https://www.cdc.gov/niosh/updates/upd-06-06-11.html ..................................8

Nat. Res. Def. Council, *Superficial Safeguards: Most Pesticides Are Approved by Flawed EPA Process* (2013), https://www.nrdc.org/sites/default/files/flawed-epa-approval-process-IB.pdf................................................................................28

S.B. 3095 S.D. 1 H.D. 1 C.D. 1, 29th Leg. (Haw. 2018) ......................................17

## CORPORATE DISCLOSURE STATEMENT AND CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fed. R. App. P. 29(a)(4)(A) and Fed. R. App. P. 26.1, *Amici* Farmworker Association of Florida, Farmworker Justice, Migrant Clinicians Network, Pesticide Action Network, United Farm Workers, and UFW Foundation each certify that they have no parent corporation and no publicly held corporation owns more than 10% of their stock. In addition, pursuant to Eleventh Circuit Rule 29-2, *amici* certify that the following persons, associations of persons, or corporations may have an interest in the outcome of this case:

1. Andiman, Alexis; counsel for *amici curiae*;

2. Apfel, Carrie; counsel for *amici curiae*;

3. Coe, Alison; counsel for *amici curiae*;

4. Earthjustice, law firm for *amici curiae*;

5. Farmworker Association of Florida, *amicus curiae*;

6. Farmworker Justice, *amicus curiae*;

7. Goldman, Patti; counsel for *amici curiae*;

8. Lehner, Peter; counsel for *amici curiae*;

9. Migrant Clinicians Network, *amicus curiae*;

10. Pesticide Action Network, *amicus curiae*;

11. United Farm Workers, *amicus curiae*;

12. UFW Foundation, *amicus curiae*.

1

## STATEMENT OF *AMICI* INTEREST[1]

*Amici* are nonprofit organizations that, collectively, represent and partner with hundreds of thousands of farmworkers across the country to minimize exposures to dangerous pesticides. As the people on the front lines directly handling pesticides and plants sprayed with pesticides, farmworkers are exposed to pesticides more frequently and in greater concentrations than any other group. They also face the greatest health risks from exposures to pesticides.

Farmworkers depend on complete and accurate pesticide labels for instructions about how best to minimize pesticide exposures and warnings about the health consequences of exposures that do occur, including the potential for poisonings, cancer, and other illnesses. Too often, existing pesticide labels lack information necessary to help farmworkers understand the risks they face, to convince supervisors of the importance of facilitating compliance with directions for use, and to enable health care providers to make prompt and accurate diagnoses. *Amici* have an interest in ensuring that farmworkers have the information they need to protect themselves and their families from pesticides. When injuries occur as a result of deficient labels, *amici* have an interest in

---

[1] All parties have consented to the filing of this brief. No party's counsel authored any part of the brief. No party, any party's counsel, or any person other than *amici* and *amici*'s counsel contributed money intended to fund the preparation of this brief.

2

ensuring that farmworkers can access courts to seek redress, expose labeling deficiencies, and spur manufacturers to correct them.

**Farmworker Association of Florida** ("FWAF") is a Florida-wide, grassroots, community-based, nonprofit farmworker membership organization with over 10,000 Haitian, Hispanic, and African American members.  Since 1983, FWAF has worked to build power among farmworkers and other rural low-income communities.  FWAF partners with farmworkers and community-members as they seek to confront and control the issues that impact their lives, including near-constant exposure to pesticides.

**Farmworker Justice** is a nonprofit organization that seeks to empower farmworkers to improve their living and working conditions, immigration status, health, occupational safety, and access to justice.  Farmworker Justice recognizes that agriculture consistently ranks as one of the nation's most hazardous occupations, farmworkers have few federal workplace safety protections, and farmworkers face a heightened risk of pesticide poisoning.  Farmworker Justice's Health Program focuses, in part, on minimizing exposures to toxic pesticides among farmworkers and their families.  Farmworker Justice long has fought to preserve farmers' and workers' rights to recover for harms caused by pesticides, including by submitting a friend-of-the court brief to the U.S. Supreme Court in *Bates v. Dow Agrosciences LLC*, 544 U.S. 431 (2005).

**Migrant Clinicians Network** ("MCN") is a nonprofit organization that works to increase access to quality health care and reduce health disparities for migrant farmworkers and other mobile underserved populations. To achieve these goals, MCN engages in research, develops appropriate resources, advocates for migrants and clinicians, engages outside partners, and runs programs that support clinical care on the front lines of migrant health. MCN has developed resources to help migrant and seasonal farmworkers protect themselves and their families from exposure to pesticides and to educate clinicians and others about the recognition and management of pesticide exposures.

**Pesticide Action Network** ("PAN") North America works to create a just, thriving food system. PAN partners with consumer, labor, health, environment, and agriculture groups worldwide to challenge the global proliferation of pesticides, defend basic rights to health and environmental quality, and work to ensure the transition to a just food system. PAN recognizes that, for farmworkers, pesticide exposures come on top of other workplace problems, including intimidation, harassment, and wage theft; PAN works with farmworker advocates across the country to address all these issues.

Begun in 1962 by Cesar Chavez, Dolores Huerta, Gilbert Padilla, and others, **United Farm Workers** ("UFW") is the nation's first and largest farmworkers' union. UFW works to protect farmworkers from occupational injuries, including

4

injures caused by exposures to pesticides, and fights to ensure that farmworkers have access to courts.  In addition, UFW champions legislative and regulatory reforms for farmworkers, covering issues such as pesticides, worker protections, and immigration reform.

**UFW Foundation**, a non-profit sister organization of UFW, is a Department of Justice-accredited immigration legal service provider that offers critical services and resources to farmworker and immigrant communities.  UFW Foundation's regional offices annually serve over 100,000 immigrants in leading agricultural regions with significant pesticide use.  As a result, UFW Foundation is directly aware of the harms that pesticide misuse and exposure pose to the health, safety, and economic security of farmworkers who handle and apply pesticides, as well as their families.

## FACTUAL BACKGROUND

In the United States, over two million farmworkers labor in an industry widely understood to be among the most hazardous.  *See* Nat'l Ins. of Occupational Safety & Health, Ctrs. for Disease Control & Prevention, *Agricultural Safety,* https://www.cdc.gov/niosh/topics/aginjury/default.html.  As the U.S. Environmental Protection Agency ("EPA") has acknowledged, "the diversity of [the farmworker population] and the tasks they perform makes it challenging to

5

ensure that [they] . . . are adequately protected."  Pesticides; Agricultural Worker

Protection Standard Revisions, 80 Fed. Reg. 67,496, 67,502 (Nov. 2, 2015).

Indeed, farmworkers face significant social and economic disadvantages.

Approximately 75 percent of farmworkers were born outside the United States, and

70 percent are not U.S. citizens.  *See* JBS Int'l, *Findings from the National*

*Agricultural Workers Survey (NAWS) 2015–16: A Demographic and Employment*

*Profile of United States Farmworkers* i (2018) ("NAWS") https://www.doleta.gov/

naws/research/docs/NAWS_Research_Report_13.pdf.  On average, farmworkers

earn between $20,000 and $24,999 each year.  *See id*. at iii.  A full third have

annual family incomes that fall below the poverty line.  *Id*.

As EPA has recognized, "[farmworkers] are potentially exposed to a wide

range of pesticides with varying toxicities and risks," and "there is strong evidence

that [farmworkers] may be exposed to [these] pesticides at levels that can cause

adverse effects."  80 Fed. Reg. at 67,498.  Farmworkers may be exposed while

mixing and applying pesticides, for example, through contact with pesticide

residues on non-target surfaces, and while weeding, harvesting, and transporting

pesticide-treated plants.

EPA estimates that about 1,800 to 3,000 acute pesticide exposure incidents

occur each year at farms, nurseries, and greenhouses across the country.  *See id*. at

67,498, 67,502.  Although this estimate accounts for *some* underreporting, it is

only an estimate; studies suggest that up to 90 percent of exposure incidents are never reported because workers often forgo treatment for fear of losing their jobs or being labelled "troublemakers," pesticide-related illnesses often are misdiagnosed, and even correctly diagnosed illnesses often are not added to a central reporting database. *See* Pesticides; Agricultural Worker Protection Standard Revisions; Proposed Rule, 79 Fed. Reg. 15,444, 15,449 (Mar. 19, 2014).

In addition, EPA's estimate excludes the difficult-to-quantify short- and long-term health problems that result from regular exposure to pesticides over months, years, and decades. *See* 80 Fed. Reg. at 67,498. Peer-reviewed scientific literature links this regular exposure to a range of serious illnesses, including various forms of cancer. *See* 79 Fed. Reg. at 15,450.

Not only do farmworkers face serious health risks as a result of their exposure to pesticides, farmworkers' *families* experience similar risks too—even if they never set foot on farms or venture inside nurseries or greenhouses. Farmworkers' family members may be exposed to pesticides through contact with the residues that workers bring home on their bodies and clothing. *See* 80 Fed. Reg. at 67,502. In addition, farmworkers, their family members, and others may be exposed through "drift," or "the movement of pesticide dust or droplets through the air at the time of application or soon after, to any site other than the area intended." *Introduction to Pesticide Drift*, EPA, http://www.epa.gov/reducing-

7

pesticide-drift/introduction-pesticide-drift.  According to the National Institute for Occupational Safety and Health, nearly 3,000 pesticide poisoning cases associated with drift occurred in 11 states between 1996 and 2008; 14 percent of those cases involved children under 15 years of age.  *See* Nat'l Ins. of Occupational Safety & Health, Ctrs. for Disease Control & Prevention, *Risk of Illness from Pesticide Drift Greatest for Agricultural Workers, Study Finds* (June 6, 2011), https://www.cdc.gov/niosh/updates/upd-06-06-11.html.

The health risks borne by farmworkers and their families are particularly concerning because many workers and their family members lack access to appropriate health care.  *See, e.g.*, 80 Fed. Reg. at 67,502.  Cost is often a significant barrier; only 47 percent of farmworkers have health insurance of any kind.  *See* NAWS at iv.  Language and cultural barriers exist as well; most health care providers lack the language skills and cultural competency necessary to treat farmworkers and their families.  In addition, providers often lack complete and accurate information about the risks associated with exposure to certain pesticides, without which they cannot provide proper care.

Because farmworkers face disproportionate risks from pesticides, they are especially dependent on pesticide labels.  Although labels are by no means sufficient to protect farmworkers from every pesticide-related illness, farmworkers with access to adequate labels are more likely to be aware of the risks they and

their families face as a result of pesticide exposure. Supervisors with access to adequate labels are more likely to understand the importance of prescribed mitigation measures—and, therefore, more likely to facilitate adherence to those measures. And health care providers with access to adequate labels are more likely to have the information they need to provide timely and effective medical care. Without widespread access to adequate labels, farmworkers and others lose a vital tool for minimizing and mitigating pesticide exposures.

## SUMMARY OF ARGUMENT

The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") prohibits the sale of any pesticide product that causes unreasonable adverse effects to human health or the environment. Where use of a pesticide can avoid such effects, the manufacturer, or "registrant," is charged with writing a product label that provides adequate warnings and directions for use. A pesticide is "misbranded" in violation of FIFRA if its label fails to provide adequate warnings or directions to protect people and the environment.

FIFRA establishes a fluid scheme that obligates manufacturers to provide the U.S. Environmental Protection Agency ("EPA") with new information about a pesticide's adverse effects, such as its potential to cause cancer, as that information emerges. FIFRA also obligates manufacturers to revise pesticide labels as necessary to ensure that they *continue to provide* adequate warnings and directions

9

for use to protect people and the environment from newly identified unreasonable adverse effects. A manufacturer who fails to make necessary revisions is liable for misbranding.

In *Bates v. Dow Agrosciences LLC*, 544 U.S. 431 (2005), the U.S. Supreme Court held that states may provide additional remedies for FIFRA violations. When injuries occur as a result of deficient labels, state tort actions can help to expose the labeling deficiencies and spur manufacturers to correct them. The mere possibility of state tort actions may encourage manufacturers to revise pesticide labels proactively, as FIFRA intends.

A pesticide's label is *not* the law. It is the vehicle for the manufacturer to provide purchasers and users with the warnings, directions for use, and other information they need to avoid unreasonable adverse effects to health and the environment. The label seeks to ensure that use of a pesticide will meet FIFRA's standards based on the information available at a particular moment in time. EPA's approval of a pesticide label provides no defense to any alleged FIFRA violation. Indeed, in registering pesticide uses and approving pesticide labels, EPA often overlooks the potential for many types of harm, such as endocrine-disrupting or hormone-mimicking effects, neurodevelopmental harm to children at low levels of exposure, and harm to bystanders from pesticide drift. EPA's approval of a label in the face of these significant gaps cannot be equated with a finding that the

label is adequate to protect the health and environment from every type of harm.

State damage actions can identify deficiencies in previously approved FIFRA

labels based on emerging science and unaddressed harms and can prompt

manufacturers to remain vigilant in ensuring their products can be used without

harming people and the environment.

### ARGUMENT

I.    FIFRA PLACES THE BURDEN ON PESTICIDE MANUFACTURERS
TO ENSURE THEIR LABELS ARE AT ALL TIMES ADEQUATE TO
PROTECT HEALTH AND THE ENVIRONMENT.

    A.    <u>Manufacturers Must Craft Pesticide Labels To Comply With FIFRA's
Protective Health Standard.</u>

As enacted in 1947, FIFRA lacked health and environmental protections.  In

1972, in the wake of Rachel Carson's *Silent Spring*, which documented damage to

the environment caused by the pesticide DDT, Congress overhauled FIFRA to

make the avoidance of "unreasonable adverse effects" its centerpiece.  *See* Pub. L.

No. 92-516, 86 Stat. 996 (1972); *see also* H.R. Rep. No. 511, 92d Cong., 1st Sess.

(1971).  As amended, FIFRA prioritizes health and the environment, and farmers

and farmworkers are "the most obvious object[s] of [its] protection."  *Organized*

*Migrants in Cmty. Action, Inc. v. Brennan*, 520 F.2d 1161, 1168–69 (D.C. Cir

1975) (quoting S. Rep. No. 92-838, at 43–44 (1972), *reprinted in* 1972

U.S.C.C.A.N. 3993, 4063); *see also* Worker Protection Standard, 57 Fed. Reg.

38,102-01, 38,102 (Aug. 21, 1992) ("The legislative history of the 1972

amendments indicates an express intent of Congress that farmers, farmworkers, and others be afforded . . . protection under FIFRA.") (citing S. Rep. No. 92-883, (Part II), 92nd Congress, 2d Session at 43–46 (1972)).

Under FIFRA, EPA must register a pesticide for the pesticide to be used in the United States.  *See* 7 U.S.C. § 136a(a).  To obtain a registration, the manufacturer must submit animal laboratory studies conducted according to EPA protocols.  *See* 7 U.S.C. § 136a(a) and (c); *see also* 40 C.F.R. §152.42; 40 C.F.R. § 152.50(f)(3).  If EPA finds that the pesticide meets FIFRA's "no unreasonable adverse effects" standard, it can register the pesticide for particular uses.

FIFRA charges the manufacturer, not the government, with devising a pesticide label that conveys adequate warnings and directions for use to protect health and the environment.  *See* 7 U.S.C. § 136a(c)(1)(C); *see also* 40 C.F.R. § 152.50(e).  Once approved by EPA, the label accompanies the product as it moves through interstate commerce.  While the label is uniform, meaning the same label is used throughout the country, it can specify different warnings and directions for different areas based on local conditions.  FIFRA makes it unlawful to use a pesticide in a manner inconsistent with its label.  *See* 7 U.S.C. § 136j(a)(2)(G).

A pesticide label is not merely a sticker affixed to the pesticide container. Instead, the label is typically a lengthy brochure, providing warnings and directions

for use for each crop and each application method. The nearly 50-page label for the insecticide Lorsban is illustrative. *See* EPA, Pesticide Product Label, LORSBAN-4E (Sept. 30, 2013)("Lorsban Label"), https://www3.epa.gov/pesticides/chem_search/ppls/062719-00220-20121221.pdf. It warns users to avoid contact between the insecticide and skin, eyes, or clothing; identifies required protective clothing and equipment; and details additional safety recommendations, such as the suggestion to "[w]ash hands before eating, drinking, chewing gum, using tobacco, or using the toilet." *Id*. at 2–3. It provides first aid instructions to be followed if Lorsban touches a user's eyes, skin, or clothing. *Id*. at 5–6. And it provides detailed directions for use, specifying how much of the pesticide may be applied to each crop for which it is registered, including apples and corn, for example. *Id*. at 21–52. Although the Lorsban label applies nationwide, it includes certain state-specific restrictions. *See, e.g.*, *id*. at 11 (explaining that Lorsban should not be "aerially appl[ied] in Mississippi").

B.    Manufacturers Have An Ongoing Duty To Update Their Labels And Are Liable For Misbranding If Their Labels Are Not Adequate To Protect Health And The Environment.

Once approved, a pesticide label is not forever static. To the contrary, FIFRA contains several provisions designed to ensure that the manufacturer will keep EPA apprised of new information regarding the pesticide's unreasonable adverse effects on health and the environment and will update the pesticide's label

13

accordingly.  First, FIFRA imposes on manufacturers an ongoing obligation to provide EPA with all factual information they acquire regarding pesticides' adverse effects on health and the environment.  *See* 7 U.S.C. § 136d(a)(2); *see also* 40 C.F.R. pt. 159.

Second, FIFRA does not allow manufacturers to rely on the fact that EPA has registered a pesticide as "a defense for the commission of any offense" under FIFRA, including an EPA action to cancel the pesticide registration or a violation of FIFRA's misbranding provision.  7 U.S.C. § 136a(f)(2).  FIFRA defines the term "misbranded" to encompass many potential flaws.  7 U.S.C. § 136(q).  For example, FIFRA provides that a pesticide is misbranded if its label does not conform to specific requirements governing the location of the ingredient statement and, for highly toxic pesticides, the inclusion of the skull and crossbones and the word "poison" in red.  *Id*. § 136(q)(2)(A), (D).  FIFRA also provides that a pesticide is misbranded if its label does not contain warnings and directions for use that are "adequate to protect health and the environment."  7 U.S.C. § 136(q)(1)(F)–(G).

Third, FIFRA imposes on manufacturers a continuing obligation to ensure that pesticide labels comply with FIFRA's requirements.  *See* 7 U.S.C. §§ 136j(a)(1)(E), 136(q).  Under FIFRA, "the burden is on the registrant to establish that continued registration poses no safety threat."  *Env't Def. Fund v.*

14

*EPA*, 510 F.2d 1292, 1302 (D.C. Cir. 1975); *see* 40 C.F.R. § 164.80 (providing that the registrant bears burden of persuasion in cancellation hearings); *see also* 110 Cong. Rec. 2948-49 (1964) (Rep. Sullivan) ("The burden of proof of safety should always be on the manufacturer . . . because great damage can be done during the period the Government is developing the data necessary to remove a product which should not be marketed."). To satisfy this burden, a manufacturer must update a pesticide label as necessary to provide additional warnings or directions for use to protect health or the environment. In turn, FIFRA mandates that "the registration shall be amended to reflect such change if the Administrator determines that the change will not violate any provision of this [Act]." 7 U.S.C. §§ 136a(f)(1); 136a(c)(5).

II.    FIFRA'S PREEMPTION PROVISION AND SUPREME COURT PRECEDENT ALLOW STATES TO PROVIDE ADDITIONAL REMEDIES FOR VIOLATING FIFRA'S MISBRANDING STANDARDS.

This case is controlled by FIFRA's preemption provision, as construed by the Supreme Court in *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597 (1991), and *Bates v. Dow Agrosciences, LLC*, 544 U.S. 431 (2005). Together, these authorities confirm that states retain the power to regulate pesticide use, and states may provide additional remedies for violations of FIFRA's requirement that pesticide labels provide adequate warnings and directions to protect health and the environment.

15

A.    <u>States Retain The Authority To Add Use Restrictions.</u>

FIFRA establishes a cooperative federalism scheme under which states are free to restrict and even ban federally approved pesticides.  This is made explicit in FIFRA's preemption provision:

> A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this [Act].

7 U.S.C. § 136v(a).  Through this provision, Congress expressly made clear that FIFRA leaves room for supplemental state requirements that afford more, but not less, health and environmental protection.

> FIFRA's preemption provision then provides:

> Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this [Act].

7 U.S.C. § 136v(b).

The Supreme Court in *Mortier* held unanimously that, although "the 1972 amendments turned FIFRA into a 'comprehensive regulatory statute,'" FIFRA "leaves substantial portions of the field vacant" and, therefore, does not preempt state or local regulation of pesticides. *Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597 (1991), at 613–14 (quoting *Ruckelshaus v. Monsanto*, 467 U.S. 986, 991 (1984)).  Instead, FIFRA's specific grant of authority to states "acts to ensure that the States could continue to regulate [pesticide] use and sales even where, such as

16

with regard to the banning of mislabeled products, a narrow pre-emptive overlap might occur." *Id*. at 614.

States have exercised this authority by banning the use of EPA-registered pesticides in their states. *See, e.g.*, S.B. 3095 S.D. 1 H.D. 1 C.D. 1, 29th Leg. (Haw. 2018). And a state's decision to ban a pesticide can inform EPA's assessment of whether that pesticide causes unreasonable adverse effects. For example, Washington State banned the highly toxic pesticide Phosdrin after it poisoned 29 workers in the state in a matter of months. The following year, EPA found that Phosdrin caused unreasonable adverse effects to workers, and the manufacturer voluntarily cancelled Phosdrin's registrations. *See* Notice of Receipt of Request for Cancellation, Announcement of Cancellation Order, and FIFRA Section 6(g) Notification for Mevinphos, 59 Fed. Reg. 38,973-02 (Aug. 1, 1994).

## B. States Can Provide Additional Remedies For Violations of FIFRA's Standards.

*Bates* built on *Mortier* by making clear that states retain authority to provide additional remedies for FIFRA violations through state actions for damages, as well as state laws and regulations. In particular, *Bates* held that nothing in FIFRA "would prevent a State from making the violation of a federal labeling or packaging requirement a state offense, thereby imposing its own sanctions on pesticide manufacturers who violate federal law." *Bates v. Dow Agrosciences, LLC*, 544 U.S. 431, 442 (2005). Imposing these additional sanctions would not

equate to imposing requirements "in addition to or different from" federal labeling requirements.

As *Bates* made clear, a state's authority to impose additional sanctions extends even to violations of FIFRA's misbranding provision. Indeed, *Bates* specifically addressed FIFRA's misbranding standard, stating that a labeling requirement imposed through state common law, including failure to warn liability, is not preempted "if it is equivalent to, and fully consistent with, FIFRA's misbranding provisions." *Id*. at 447; *accord id*. (holding that "state law need not explicitly incorporate FIFRA's standard as an element of a cause of action in order to survive pre-emption").

*Bates* viewed state remedies that enforce federal misbranding requirements "to aid, rather than hinder, the functioning of FIFRA." *Id*. at 451. Such remedies help to ensure that manufacturers will revise pesticide labels as necessary to protect people and the environment from newly identified unreasonable adverse effects, just as FIFRA intends. *Id*.

*Rumsey v. Freeway Manor Minimax*, 423 S.W.2d 387 (Tex. Civ. Appeals Ct. 1968), is illustrative. In that case, the Texas Court of Appeals upheld a finding of negligence after a three-year-old boy died as a result of coming into contact with an insecticide for which there was no antidote. Though the insecticide's label "was approved by the appropriate agencies," the court nonetheless concluded that the

manufacturer had been negligent in failing to disclose the lack of an antidote on the insecticide's label. *Id*. at 394. *Rumsey* predates FIFRA's focus on health and the environment, but it supports the goals of the amended Act by incentivizing manufacturers to ensure that labels disclose the *full* range of risks associated with pesticide use. Indeed, the specter of damage actions may provide manufacturers with economic incentives to stay abreast of possible injuries from use of their pesticides and make needed label changes proactively, before any injuries occur. *See* 544 U.S. at 451.

III.  FIFRA DOES NOT PREEMPT CARSON'S FAILURE-TO-WARN CLAIM.

In denying Carson's failure-to-warn claim, the district court concluded that requiring a warning that glyphosate causes cancer would be in direct conflict with EPA's finding that glyphosate is "not likely to be carcinogenic to humans" and that FIFRA therefore preempted this claim. *Carson v. Monsanto*, No. 4:17-00237, at 7–8. The district court's conclusion is foreclosed by *Bates*.

A.  States Can Provide Remedies That Lead To Changes In EPA-Approved Labels In Order To Avoid Misbranding.

Although FIFRA preempts states from imposing different labeling *requirements*, as *Bates* held, it leaves states free to establish additional *remedies* for violating FIFRA's misbranding provision and other requirements. State tort liability is a permissible additional remedy. Even if state tort liability *induces* a

19

pesticide manufacturer to change its label, that change is a voluntary response by the manufacturer, not a state-imposed requirement that could be preempted under FIFRA. *See* 544 U.S. at 445–46. Indeed, the manufacturer could respond to its liability in many ways including, for example, by ending the offending use, adding warnings, or requiring mitigation measures. Spurring the manufacturer to take any of these actions furthers FIFRA's goal of protecting health and the environment. The Supreme Court did not view EPA as having a gatekeeper role, allowing it to dictate how a manufacturer should respond to a jury verdict or precisely how it should change its label to comport with a state standard of care that parallels FIFRA's legal standards. *See id.* at 436, 438, 439.

A pesticide's label is not law – it does not by itself establish the legal standard of conduct under FIFRA. Rather, FIFRA's misbranding provisions establish the legal standard. Indeed, the fact that EPA has registered a pesticide use and approved a pesticide label is no defense to *any* violation of FIFRA. *See* 7 U.S.C. § 136a(f)(2). If EPA approved a label that lacks adequate warnings or directions for use to protect health or the environment, the pesticide is misbranded, and EPA's approval does not immunize the manufacturer from liability. Violating the label is an offense under FIFRA, but that does not make the label a legal standard with preemptive effect.

B.   EPA Has No Monopoly On Determining What Constitutes Misbranding.

EPA is not the sole determinant of what constitutes misbranding.  In *Bates*, the United States argued that states could not impose failure to warn liability "absent an EPA finding of misbranding."  Brief for the United States as Amicus Curiae Supporting Respondent at 25, *Bates v. Dow Agrosciences LLC*, 544 U.S. 431 (2005)(No. 03-388), 2004 WL 2681684.  Similarly, Dow warned that state juries might conclude that pesticides are misbranded even if EPA already had rejected such claims, and EPA thus might be compelled to approve a label warning with which it disagreed.  *See* Brief of Respondent at 37–38, 41–42, *Bates v. Dow Agrosciences LLC*, 544 U.S. 431 (2005) (No. 03-388), 2004 WL 2758217("Dow Brief").  The Supreme Court rejected these arguments.

As *Bates* recognized, "juries are in no sense anathema to FIFRA's scheme: In criminal prosecutions for violation of FIFRA's provisions, . . . juries necessarily must pass on allegations of misbranding."  544 U.S. at 452 (internal citation omitted).  EPA also has authority under FIFRA to issue stop sale or use orders, initiate cancellation proceedings, and seek civil penalties for misbranding and other violations of FIFRA.  *See* 7 U.S.C. §§ 136d (cancellation proceedings), 136k(a) (stop sale or use orders), 136l (civil or criminal penalties).  Each of these actions either proceeds through or can be challenged in administrative and/or judicial proceedings.  In such proceedings, administrative law judges and courts may

21

disagree with EPA's application of FIFRA's misbranding requirements to a particular label and overturn its action.

FIFRA allows states to assume primary enforcement authority for pesticide use violations upon EPA approval of the state's pesticide use laws and enforcement and recordkeeping procedures. *See* 7 U.S.C. § 136w-1(a). Once EPA delegates primary enforcement authority to a state, the state can bring actions to cancel registrations of pesticides. When a state exercises its enforcement authority, state courts or administrative tribunals decide whether cancellation is appropriate.

Thus, EPA has no monopoly on deciding whether a pesticide is misbranded. Its approval of pesticide labels has no preclusive effect on state actions to prevent misbranding and enforce other requirements.

C.    EPA's Approval Or Disapproval Of A Label Has No Preemptive Effect.

The district court's conclusion suggests that EPA can effectively preempt state tort liability by disapproving a label change, as it at one time purported to do with a letter disapproving of California's state law warnings for glyphosate. *See Carson v. Monsanto*, No. 4:17-00237, at 3 (noting EPA's position that it will "no longer approve labeling that includes [California's] warning statement for

glyphosate-containing products.")[2]  EPA's action on a requested label change,

however, has no preemptive effect.

In *Bates*, Dow argued that allowing juries "to give content to FIFRA's

misbranding prohibition" would "establish[] a crazy-quilt of anti-misbranding

requirements."  Dow Brief at 16.  In trying to make the case for conflict

preemption, it argued that a state jury verdict would require a change in the label,

but such a change cannot be made without EPA permission.  *See* Dow Brief at 37.

Dow elaborated:

> If a different jury were to reject similar challenges to the same label,
> . . . that result would indicate that there was no basis for EPA to
> approve any change to the label.  Moreover, EPA might well not agree
> with the judgment that the labeling change effectively required by the
> adverse jury verdict was appropriate.  Manufacturers therefore could
> quickly find themselves in conflicting positions vis-à-vis both state
> and federal law.

*Id*.

In rejecting this argument, *Bates* found no evidence that state tort suits had

produced a crazy-quilt of requirements or that they would pose difficulties beyond

---

[2] After California revised its cancer warning for products containing glyphosate, EPA indicated that it would approve labels containing that revised warning and would not consider labels containing the warning misbranded.  *See* Letter to Dr. Lauren Zeise, Dir. Office of Env't Health Hazard Assessment, Ca. EPA, from EPA Assistant Admin. Michal Freedhoff, Ph.D (April 8, 2022), https://oehha.ca.gov/media/downloads/crnr/usepaaafreedhofftooehhadirzeiseglyphosate40822.pdf (last visited February 3, 2023).

those manufacturers regularly experience due to the risk of competing jury verdicts. *See* 544 U.S. at 451–52. And if issues arose, EPA could respond by promulgating regulations that refine FIFRA's general misbranding prohibitions. *See id.* at 453 & nn. 27–28. The Court pointed out that EPA regulations give content to some of FIFRA's misbranding prohibitions by, for example, requiring use of the word "caution" instead of "danger," but they simply reiterate FIFRA's broadly phrased requirements to have warnings and directions for use that are adequate to protect health and the environment. *See id.* at 453 & n.28. This remains the case.

While regulations promulgated pursuant to EPA's delegated authority have the force of law and preemptive effect under the Supremacy Clause, *see, e.g.*, *City of New York v. Fed. Communications Commission*, 486 U.S. 57, 63–64 (1988), EPA's approval or disapproval of a label change does not for at least three reasons. First, to have preemptive effect, an agency action must interpret the controlling law by addressing an ambiguity or filling in a gap in the statute. *See U.S. v. Mead Corp.*, 533 U.S. 218, 226–27, 229 (2001). A label approval is not an authoritative and general interpretation of FIFRA. Rather, it is an application of FIFRA's misbranding requirements to a particular set of facts, and as a result it has no preemptive effect. *See Reid v. Johnson & Johnson*, 780 F.3d 952, 964 (9th Cir. 2015) (explaining that agency enforcement guidelines set out in a letter have no

preemptive effect); *see also Fellner v. Tri-Union Seafoods, LLC*, 539 F.3d 237, 254–552 (3rd Cir. 2008) (concluding that an FDA letter deciding not to require warnings did not preempt failure to warn claims).

Second, to have preemptive effect, the agency must act pursuant to delegated statutory authority and conform to governing procedural requirements. *See* 486 U.S. at 63–64. EPA has express authority to promulgate regulations interpreting FIFRA, which can have preemptive effect if EPA complies with specific notice-and-comment rulemaking and consultation requirements. *See* 7 U.S.C. § 136w-1(a). But EPA is not acting pursuant to this authority or in accordance with the required procedures when it approves or disapproves a label. Although EPA's labeling decisions can be challenged in court, *see* 7 U.S.C. § 136n, that fact alone is insufficient to give label approvals preemptive effect.

Third, in acting on a proposed label change, EPA must follow prescribed procedures and adhere to FIFRA's requirements. Under FIFRA, EPA must have before it a proposed label, including the warnings and directions for use that the manufacturer seeks to add. *See* 7 U.S.C. § 136a(c)(1)(C). EPA must approve the label change if it determines the proposed label will not violate FIFRA. *Id.* § 136a(f)(1). And its action must be reasonable, meaning not arbitrary, capricious, or in violation of the governing statute. *See* 533 U.S. at 227, 229.

25

IV.    EPA'S APPROVAL OF A MANUFACTURER'S PROPOSED LABEL OFTEN FAILS TO ADDRESS IMPORTANT HEALTH RISKS, AND TORT LIABILITY CAN INDUCE THE MANUFACTURER TO FILL THE GAPS.

It is often the case that EPA's registration of a pesticide and approval of the manufacturer-drafted pesticide label overlook serious harms that later emerge.  For example, EPA never passed on the accuracy of the label statement at issue in *Bates*, which represented that the pesticide could be used in all areas where peanuts are grown.  While *Bates* acknowledged that EPA's review of pesticide efficacy had been waived, *see* 544 U.S. at 440, its holding that FIFRA does not preempt state remedies for violating FIFRA's misbranding standard is in no way limited to efficacy claims, *id*. at 447–49.  Indeed, EPA's misbranding regulations expressly prohibit false and misleading statements about a pesticide's effectiveness.  *See* 40 C.F.R. § 156.10(a)(5)(ii).  And, under *Bates*, states can provide additional remedies for violations of this prohibition.

Here, EPA conducted a registration review of glyphosate, the active ingredient in Roundup.  Its conclusions about carcinogenicity and letter about cancer warnings pertain only to glyphosate.  But Roundup contains other chemicals in addition to glyphosate.  This is commonplace.  Inert ingredients make up the bulk of most pesticide product formulations, and many such inert ingredients are listed as hazardous chemicals by EPA and other federal agencies under statutes regulating exposure to toxic chemicals.  And these inert ingredients,

in combination with the active ingredients, can be harmful.  For example, a recent study revealed that glyphosate plus the inert ingredients used to create Roundup is highly toxic to bees.[3]  While EPA has the authority to require pesticide labels to disclose the presence of such hazardous inert ingredients, it has not done so for every pesticide product.  *See Ctr. for Env't Health v. McCarthy*, 192 F. Supp. 3d 1036, 1039, 1042, 1044 (2016).  If this case proceeded on the merits, Carson could argue that Roundup – rather than glyphosate – is carcinogenic.  If true, the state damages action could serve an important gap-filling purpose by prompting Monsanto to update the Roundup label so that it properly discloses the risks associated with use of Roundup—not just its active ingredient.

EPA often misses significant health risks in its reviews of pesticides and pesticide labels.  FIFRA has mechanisms to gather additional information and requires EPA to conduct additional reviews both in response to petitions presenting new evidence of harm and as a matter of course for each pesticide every 15 years.  *See* 7 U.S.C. § 136a(g)(1)(A)(iii).  The following examples are illustrative of gaps in protection left by existing registrations.

First, FIFRA allows EPA to conditionally register a pesticide pending submission of missing data.  *See* 7 U.S.C. § 136a(c)(7).  EPA has invoked this

---

[3] *See* Edward A. Straw et al., *Roundup Causes High Levels of Mortality Following Contact Exposure in Bumble Bees*, J. Applied Ecology (2021).

authority extensively to approve over half of consumer and agricultural products. *See* Nat. Res. Def. Council, *Superficial Safeguards: Most Pesticides Are Approved by Flawed EPA Process* (2013), https://www.nrdc.org/sites/default/files/flawed-epa-approval-process-IB.pdf.  EPA may be unaware of the full range of adverse effects associated with conditionally registered pesticides given the missing data. *See Pollinator Stewardship Council v. EPA*, 806 F.3d 520 (9th Cir. 2015) (vacating EPA's unconditional registration of sulfoxaflor because EPA had failed to obtain the studies on sulfoxaflor's toxicity to bees that it had deemed necessary when it conditionally registered the pesticide).

Second, Congress has directed EPA to keep abreast of emerging health risks, but EPA's progress is often slow.  For example, in 1996, Congress directed EPA to assess the potential for food-use pesticides to cause endocrine-disrupting—that is, hormone-mimicking—effects.  *See* 21 U.S.C. § 346a(b)(2)(D)(viii).  EPA re-registered older pesticides in 2006 without obtaining the required studies, and it is still in the midst of the screening process.  *See* EPA, *Endocrine Disruptor Screening Program Timeline*, https://www.epa.gov/sites/production/files/2016-04/documents/edsp-timeline-042016.pdf.

Third, farmworkers and others filed a petition asking EPA to establish no-spray buffers around schools, homes, and other places people gather for two classes of neuro-toxic pesticides because general label instructions had failed to

prevent acute poisonings from pesticide drift.  In response to the petition, EPA acknowledged its legal obligation to address pesticide drift and provide more specific safeguards, but indicated it would do so in its registration reviews of individual pesticides.  *See* Agency Response to Pesticides in the Air – Kids At Risk: Petition to EPA to Protect Children from Pesticide Drift (Mar. 31, 2014), www.regulations.gov at EPA-HQ-OPP-2009-0825-0084.  EPA has failed to complete registration reviews for many dozens of pesticides and now has until 2026 to do so.  In the meantime, it has required no label amendments requiring measures to prevent or reduce harm from pesticide drift.  *See* Omnibus Appropriation Bill, H. Rep. No. 2671, § 711(a), 117th Cong., 2d Sess. (Dec. 20, 2022) (extending registration review deadline by four years to October 1, 2026).

Fourth, a 2007 petition sought to protect children from the pesticide chlorpyrifos based on a growing body of published peer-reviewed science correlating learning disabilities and permanent damage to children's brains with exposures to chlorpyrifos.  Upon reviewing the science, EPA concluded that chlorpyrifos damages children's brains, and the registrations and labels failed to prevent this harm.[4]  EPA proposed to end food uses of chlorpyrifos in 2015.[5]  After

---

[4] *See, e.g.,* EPA, Revised Chlorpyrifos Human Health Risk Assessment (Dec. 29, 2014), www.regulations.gov at EPA-HQ-OPP-2008-0850-0195.
[5] *See* Chlorpyrifos; Tolerance Revocation, 80 Fed. Reg. 69,080-01 (Nov. 6, 2015).

years of litigation and delay, a court ordered EPA to significantly modify or cancel all tolerances and all FIFRA registrations for food uses of chlorpyrifos.  *See League of United Latin Am. Citizens et al. v. Regan*, 996 F.3d 673 (9th Cir. 2021). In response, EPA revoked all chlorpyrifos tolerances, and it has since proposed cancellation of all registrations of chlorpyrifos for food uses.  *See* Chlorpyrifos; Tolerance Revocations, 86 Fed. Reg. 48,315-01 (Aug. 30, 2021); *see also* Chlorpyrifos; Notice of Intent To Cancel Pesticide Registrations, 87 Fed. Reg. 76,474-02 (Dec. 14, 2022).  During the pendency of this multi-year challenge, EPA did not change the registration or require label revisions adequate to protect health and the environment, in violation of FIFRA.

In short, EPA's approval of a label is confined to the information before it at the time of that approval, which often fails to capture the full range and nature of harm from the pesticide.  And new information constantly emerges.  While EPA has the authority and duty to review such evidence, its reviews are often slow, leaving people in harm's way for too long.

By design, however, EPA registration decisions and pesticide labels are not fixed for all time.  FIFRA builds in feedback loops and ongoing duties. Manufacturers must submit adverse effects information, including information arising from litigation, *see* 40 C.F.R. § 159.160(c), and conduct further studies to address evolving science.  And manufacturers have an ongoing duty to ensure that

30

their labels provide adequate warnings and directions for use to protect health and the environment.  State tort liability can add incentives to fulfill this obligation and afford farmworkers, their families, and others harmed by pesticides an avenue for relief where federal remedies fall short.

## CONCLUSION

For these reasons, *amici* respectfully ask this Court to reverse the district court's ruling on preemption.


Respectfully submitted this 13th day of February, 2023.


*s/* Patti Goldman
PATTI GOLDMAN
Earthjustice
810 Third Ave., Ste. 610
Seattle, WA 98104-1711
(206) 343-7340
pgoldman@earthjustice.org

CARRIE APFEL
Earthjustice
1001 G Street, NW, Suite 1000
Washington, DC 20001
(202) 797-4310
capfel@earthjustice.org

ALEXIS ANDIMAN
PETER LEHNER
Earthjustice
48 Wall St., 19th Flr.
(212) 845-7376
aandiman@earthjustice.org
plehner@earthjustice.org

ALISA COE
Earthjustice
111 S. Martin Luther King, Jr. Boulevard
Tallahassee, FL 32301
(850) 681-0031
acoe@earthjustice.org

*Counsel for Amici Curiae Farmworker
Association of Florida, Farmworker Justice,
Migrant Clinicians Network, Pesticide
Action Network, United Farm Workers &
UFW Foundation*

## CERTIFICATE OF COMPLIANCE

I certify that the following statements are true:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a) because it contains 6,513 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman.

Dated:  February 13, 2023

*s/* Patti Goldman
PATTI GOLDMAN
Earthjustice
810 Third Ave., Ste. 610
Seattle, WA 98104-1711
(206) 343-7340
pgoldman@earthjustice.org

*Counsel for Amici Curiae Farmworker Association of Florida, Farmworker Justice, Migrant Clinicians Network, Pesticide Action Network, United Farm Workers & UFW Foundation*

33

## CERTIFICATE OF SERVICE

I hereby certify that on February 13, 2023, I electronically filed this brief with the Clerk of the Court for the U.S. Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system. I certify that the foregoing document is being served this day on all counsel of record, and that service will be accomplished by the appellate CM/ECF system.

Dated:  February 13, 2023

> *s/* Patti Goldman
> PATTI GOLDMAN
> Earthjustice
> 810 Third Ave., Ste. 610
> Seattle, WA 98104-1711
> (206) 343-7340
> pgoldman@earthjustice.org
>
> *Counsel for Amici Curiae Farmworker Association of Florida, Farmworker Justice, Migrant Clinicians Network, Pesticide Action Network, United Farm Workers & UFW Foundation*